HOLLAND FURNACE CO. v. UNITED STATES.

BOYD v. SAME.

Nos. 10216, 10215.

Circuit Court of Appeals, Sixth Circuit.

Dec. 4, 1946.

I. War ⬤—4

Wm. E. Knepper, of Columbus, Ohio (Paul E. Cholette, of Grand Rapids, Mich., and Wm. E. Knepper, of Columbus, Ohio, on the brief), for appellants.

Ray J. O'Donnell, of Columbus, Ohio (Ray J. O'Donnell, of Columbus, Ohio, on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

MARTIN, Circuit Judge.

Appellants Holland Furnace Company, a corporation, and William Boyd were fined respectively $7,500 and $1,000 upon conviction by jury verdict in the district court on a criminal information charging violation of General Limitation Order No. L79 of the War Production Board, as amended April 25, 1944.

The criminal information charged that the individual appellant, the corporate appellant, and C. A. Hall delivered to Charles E. Bowen, Sr., a heating furnace as defined in War Production Board Order No. L22, well knowing the required consumer's certificate signed by Bowen to be false. The pertinent portions of the order which appellants were found guilty of violating provided that no person may deliver a heating furnace of the character delivered, except to a consumer for installation to replace existing equipment which is worn out, damaged beyond repair, or destroyed, and that no delivery may be made to replace usable equipment or make a substitution which would provide more extensive facilities than are necessary to replace the part, or parts, worn out, damaged, or destroyed. The applicable order provides, further, that no seller may deliver such heating furnace unless he obtains a consumer's certificate substantially as defined; that no one may deliver such furnace relying upon a certification being true, if he knows or should know it to be false; *but that anyone who reasonably relies on the truth of the certi-*

*ficate is not to be held responsible if it turns out to be false.* Provision was made for punishment by fine, or imprisonment, or both, for wilful violation of the order.

The Holland Furnace Company, a Delaware corporation with its main office in Holland, Michigan, and with some 300 main branches and 100 subbranches, did business in approximately 40 states and had been engaged in the heating business about 40 years. Among its 4,000 employees, the acquitted defendant, C. A. Hall, was its manager in Columbus, Ohio, and the convicted appellant, William Boyd, was a senior salesman who, at the time of the transaction in question on or about July 20, 1944, worked out of its Columbus office.

Charles E. Bowen, who described himself as in "charge" of two Methodist Churches and as a salesman for a milk company, testified that, on the afternoon of June 7, 1944, while his wife was down town, a man knocked on the door and, upon entering the house, said that he represented the Holland Furnace Company and was soliciting business pertaining to cleaning and recementing furnaces; and that he would like to see the Bowen furnace. Being a prudent husband, Mr. Bowen said, "my wife is not here"; and invited the solicitor to come back in the evening, which he did. After the wifely approval had been obtained and the furnace, *which was only two years old,* had been inspected, the solicitor stated that the furnace would be torn down and an engineer sent out to inspect it for defects. He took an order from the Bowens for cleaning and repairing the furnace at a cost of $28.

Bowen testified further that, on the following morning, "men came out and tore the furnace out"; and that appellant Boyd came out later in the day and represented himself to be the engineer. He and Mr. and Mrs. Bowen went down into the basement to inspect the furnace. During the inspection, Boyd pointed out numerous alleged defects and, according to Bowen, said: "It is a wonder you folks haven't been asphyxiated before this. Gas is escaping through those places burning out." Boyd declared that the furnace could not be repaired, and said: "The best thing for you folks to do is to buy a new furnace."

"How in the world can we buy a new furnace so soon," asked Bowen, "in regard to this war business?" Boyd replied: "We can get it for you if you want it."

After they had been shown different types of Holland furnaces a contract for a new furnace was executed by Bowen and his wife; and, simultaneously, a consumer's certificate in the following language, which Bowen stated he did not read and the contents of which he did not know, was signed by him: "I need the item included in this purchase to replace equipment worn out, damaged beyond repair, or destroyed. I will not use it to replace usable equipment or to make a substitution which would provide more extensive facilities than are necessary to replace the parts which are worn out, damaged, or destroyed."

Mrs. Bowen corroborated the testimony of her husband concerning his failure to read the consumer's certificate, and asserted that Boyd had several sheets of paper fastened together and just turned each over and said; "Sign there." Being dissatisfied after the new furnace was delivered, the Bowens refused to pay for it, were sued in a Court of Common Pleas of Ohio for the contract price, and filed a cross action based on fraud and misrepresentation. The state court litigation was dismissed without prejudice.

The old furnace was removed by Parker, who was engaged in the trucking business and worked for the Holland Furnace Company during the summer of 1944. Under his arrangement with the company, he was to junk old furnaces taken to his yard and to account to the corporation for the same on the basis of $15 a ton. He delivered the new furnace to the Bowen home at the time he picked up the old one, which he set up in his yard with the intention of using it in his own home. However, after taking the furnace to his basement, he sold it for $35 to Fred C. Hauck, Assistant Manager of the Columbus Better Business Bureau. Hauck testified that he rode on the truck which transported the furnace from Parker's basement to the Home Furnace Company, where he stored it and where it remained until removed to the United States District Courtroom for exhibition upon the trial of the instant case.

Fred W. Gurley, Chief Heating Inspector for the City of Columbus, Ohio, identified the furnace produced in the courtroom as that which he had inspected, when new, at the Bowen home in 1942. The furnace then had, in his opinion, a normal serviceable life of from fifteen to twenty years. Arthur D. Bogen of the Home Furnace Company, an expert who had installed the furnace in Bowen's home in 1942, swore that, except for being rusty, the furnace was in excellent condition when exhibited in the courtroom.

In addition to Gurley and Bogen, two other experts, Favret and Norland, members of the Heating Examining Board of Columbus, identified the furnace exhibited in the courtroom as the same as that which they had inspected at the Home Furnace Company. Three of these experts declared that the only thing wrong with the furnace was a broken shaker handle, and the fourth stated that there was a broken shaker arm and a broken shaker lever.

Boyd, in his own defense, testified that some of the important parts of the exhibited furnace were not the same as those of the furnace which had been in the Bowen basement when he made the contract to deliver a new furnace. He described alleged defects and damaged parts in the Bowen furnace, and swore that in his opinion it qualified for replacement under the General Limitation Order, L79, of the War Production Board; but he admitted that the Bowen furnace had looked like a "fairly new furnace" and that he had been surprised to find defects in such a new furnace.

Weyenberg, Chief Engineer of the Holland Furnace Company, an expert witness for defendants, pointed out certain defects in the exhibited furnace, but admitted that it was not damaged beyond repair. Later, after Boyd had testified, he corrected his testimony and stated that certain defects to which he had previously alluded were not defects at all.

■ Viewing the testimony of all the experts, the inference is inescapable that the furnace exhibited in the courtroom was not "worn out, damaged beyond repair, or destroyed." Indeed, it has been stipulated that the parts of the furnace shown in the

district court need not be included in the record on this appeal and that the appellants, Holland Furnace Company and William Boyd, "will not contend in their said appeals that any of said parts of said furnace are worn out, damaged beyond repair, or destroyed."

The employment contract entered into by the appellant corporation with its salesman, Boyd, contained provisions that sales made by Boyd should be subject to approval by the company's local branch manager and by its general office; and that commissions to be paid him under the contract should not be due until the sales were approved by the company's branch manager, its general office, and by the "customer invoiced."

From the testimony of C. A. Hall, the acquitted co-defendant, it appears that, as manager of the Columbus branch of the Holland Furnace Company, he approved the sale of the new furnace to Bowen; but that, in doing so, he had relied upon the contract, the consumer's certificate of necessity, and the credit report upon Bowen. He stated positively that he had never seen the furnace which was removed from the Bowen home and had absolutely no knowledge that the statements contained in the consumer's certificate were false. The new furnace had been delivered under his direction.

Benjamin B. Staal, who, as branch comptroller of the company in the home office at Holland, Michigan, had supervision over the approval or disapproval of contracts of customers, particularly with reference to compliance with War Production Board Order No. L79, testified that when the general office approved the contract with Bowen for the purchase of a new furnace the truthfulness of the allegations contained in the consumer's certificate had been relied upon entirely; and that he had no information that the statements made in the certificate signed by the customer were untrue.

The Chief Engineer, Weyenberg, testified that the Holland Furnace Company depended upon the judgment of appellant Boyd as a furnace expert, and accepted his opinion that a furnace was beyond repair and should be replaced.

Numerous bulletins emphatically admonishing absolute obedience to the orders and regulations of the War Production Board were issued by the home office of the Holland Furnace Company and sent out to its branches. Hall, manager of the Columbus branch office, received these bulletins and discussed them at morning meetings with the salesmen. Each salesman received a copy of most of these bulletins. Boyd admitted that he read and studied the pamphlets as and when received.

■ The reading of these bulletins is convincing upon the issue of the good faith of the appellant corporation in attempting to obtain from its employees compliance with the pertinent government regulations. For example, the pamphlet issued June 1, 1943, addressed "Holland Men", points out that it is to their benefit, as well as their personal responsibility, to understand fully, to comply with, and to keep up to date on all government regulations pertaining to the business.

Another bulletin of the Holland Furnace Company leads off with the words: "Enforce! Government Regulations Covering Replacement Furnace and Repair Parts Sales." The employees are warned that anyone will be discharged who wilfully violates the government regulations. Specific regulations are explained and caution given that no business shall be taken, except in conformity with them.

In a bulletin issued February 14, 1944, Holland men are admonished that they "must firmly resist every border-line case where a new furnace is not absolutely necessary", and are told: "If there's any doubt, give the benefit of it to the government." The admonition continues: "There aren't nearly enough new furnaces to go around to all who need them. That's a tough situation,—and it must not be made any tougher by letting even so much as a single one get out where the deal isn't as clean as a hound's tooth."

As late as April 2, 1945, a bulletin was issued, warning that War Production Board Regulations were still in effect; that no one should get careless under the intoxication of war news; that the company had made adherence to the regulations its firm and

fixed policy; and that "any manager who might think he is bigger than either the company or the government will have to personally pay the consequences of any such foolishness."

The respective appeals of Boyd and the Holland Furnace Company have been heard together. The same attorneys have appeared for each, and joint briefs have been filed.

In behalf of Boyd, counsel contend that there is no evidence that he aided, abetted, counseled, commanded, induced, or procured Holland to commit the offense charged, or that he "delivered" a furnace to Bowen. From the foregoing review of the evidence, it is obvious that the argument cannot stand. It abundantly appears that Boyd, well knowing that Bowen's furnace was not "worn out, damaged beyond repair, or destroyed", actively induced Bowen to execute a contract for the purchase of a new furnace and to sign a false customer's certificate of necessity. The criminal intent of Boyd is glaring. Nor can Boyd escape the penalty for infraction of Order L79 of the War Production Board, as amended, upon the tenuous ground that he did not "deliver" the furnace to Bowen. His high-pressure salesmanship was the causa causans of the delivery. His false and fraudulent representations in inducing Bowen to sign the contract and the consumer's certificate were undoubtedly the direct cause of the subsequent physical delivery of the furnace. No such narrow interpretation of the word "delivery" in the War Production Board Order as Boyd would have us indulge is justifiable in view of the manifest purpose of the War Production Board in its Order L79 to prevent the unlawful delivery of furnaces, and to punish wilful offenders in the context.

Among the several points upon which it relies on appeal, the Holland Furnace Company avers that the trial court erred in refusing to grant its motion for a directed verdict, made at the close of the Government's case and renewed upon conclusion of all the evidence adduced. It is not to be disputed that the Holland Furnace Company delivered the furnace in controversy in reliance upon the truth of the consumer's certificate signed by the purchaser, and that no officer or employee of the company in its main office at Holland, Michigan, had knowledge of the falsity of the certificate. Moreover, its branch manager at Columbus, Ohio, was acquitted by the jury, which eliminates the existence of imputable guilty knowledge upon his part. The record reveals that the main office of the corporation frequently admonished in strongest terms branch managers and employees to comply faithfully with the regulations of the War Production Board with respect to the sale and delivery of new furnaces.

The Government insists nevertheless that a corporation is criminally responsible for the acts of its agent while acting within the scope of his employment in the business of the corporation; and that the conviction of the Holland Furnace Company should be sustained for the reason that Boyd was so acting. New York Central and Hudson R. R. v. United States, 212 U.S. 481, 29 S.Ct. 304, 53 L.Ed. 613, is declared by the United States Attorney to be the leading case on the subject of the liability of a corporation for the criminal acts of its agent. There, the Supreme Court, in construing the Elkins Act, 32 Stat. 847, 49 U.S.C.A. § 41 et seq., found it necessary to consider the criminal responsibility of a corporation for an act done while an authorized agent of the company was exercising the authority conferred upon him. The conviction of the railroad company and its assistant traffic manager for the payment of rebates to shippers was upheld. The generalizations of Mr. Justice Day in the opinion [at pages 492-496 of 212 U.S., at pages 306, 307 of 29 S.Ct., 53 L.Ed. 613], upon which the Government places so much dependence, must be read in the context of the statute which was under construction. The last paragraph of Section 1 of the Elkins Act, 49 U.S.C.A. § 41, specifically provided: "In construing and enforcing the provisions of this section the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier acting within the scope of his employment shall in every case be also deemed to be the act, omission, or failure of such carrier as well as that of the person."

To the contrary, War Labor Board Order L79 expressly provides that anyone who reasonably relies on the truth of the consumer's certificate is not to be held responsible, should it turn out to be false. It is, therefore, apparent that the statute under interpretation in the New York Central case and the War Production Board order which must be construed in the present controversy are diametrically opposite in the expression of conditions of criminal responsibility.

■ We do not perceive wherein United States v. Illinois Central Railroad Co., 303 U.S. 239, 58 S.Ct. 533, 534, 82 L.Ed. 773 [Cf. United States v. Baltimore & O. S. W. R. R. Co., 6 Cir., 159 F. 33, fortifies the position of the Government. The Supreme Court merely sustained a judgment against a carrier, in an action brought by the United States to recover a penalty, for the reason that, as a matter of law, the facts found showed conclusively that the railroad company had "knowingly and wilfully" failed to comply with an Act of Congress requiring that cattle should not be confined in cars for longer than a specified period without unloading them into properly equipped pens for rest, water and feeding. The failure of its employees to unload the cattle within the time demanded by the statute was held sufficient to render the carrier liable. The statute imposed an affirmative, nondelegable duty upon the corporation. The same may not be said of War Production Board Order L79.

The Government brings forward United States v. Dotterweich, 320 U.S. 277, 281, 64 S.Ct. 134, 137, 88 L.Ed. 48, for our consideration. In that case, the president and general manager of a corporation was found guilty of violating the Federal Food, Drug, and Cosmetic Act, 21 U.S.C.A. § 301 et seq., but the jury disagreed as to the guilt of the corporation. The conviction of the individual defendant was upheld. In the opinion, observations were made that the only way in which a corporation can act is through the individuals who act on its behalf; that the historic conception of a misdemeanor makes all those responsible for it equally guilty; and that "as a matter of legal development, it has taken time to establish criminal liability also for a corporation and not merely for its agents." The acceptance of these truths does not point the way to decision here; and, upon its facts, the Dotterweich case is entirely differentiable.

We are of opinion that the authorities cited by the United States Attorney from the lower federal courts are also not decisively in point. Mininsohn v. United States, 3 Cir., 101 F.2d 477, holds that the guilty intent of corporate officers to commit a crime may be imputed to the corporation to prove its guilt. In Egan v. United States, 8 Cir., 137 F.2d 369, the acts for which a corporation was held criminally responsible were perpetrated by its officers. In Old Monastery Co. v. United States, 4 Cir., 147 F.2d 905, 908, it was emphasized in the last paragraph of the opinion that, in negotiating and carrying out an unlawful contract for the sale of whiskey, the *president* of the convicted corporation was acting, not as an individual, but in the role of *president* and representative of the corporation within the scope of his corporate capacity, both actual and apparent. C. I. T. Corporation v. United States, 9 Cir., 150 F. 2d 85, 89, was a case in which a money lending corporation was held criminally liable for the unlawful acts of a *branch manager* in connection with loans. The argument was rejected that the branch manager was "too low in the corporate heirarchy" to bind the company in causing to be made false credit statement-applications to the administrator of the Federal Housing Administration. The Circuit Court of Appeals stated that "it is the function delegated to the corporate officer or agent which determines his power to engage the corporation in a criminal transaction." Our impression from the opinion of District Judge Neterer in United States v. Wilson, D.C.W.D.Wash., 59 F.2d 97, 98, is that it was obvious to him from the evidence that the defendant corporation had knowledge of the unlawful purpose to which its salesman would put its product, or was at least reasonably put upon inquiry and therefore could not escape criminal liability "by issuing rules of restricted conduct to its agents."

In the case at bar, there is a total lack of proof that any officer of the corporation was particeps criminis with its salesman, Boyd. Nor was anyone as high in authority as branch manager among the company's 4,000 employees proven to be a partner in the crime. The emphatic admonition of the corporation to its agents against an unlawful act such as Boyd committed has been previously detailed. The sweeping dicta in some of the authorities would seem to lend some support to the Government's position; but to hold the corporation, Holland Furance Company, criminally liable for Boyd's unlawful acts *on the facts of this case* would carry corporate responsibility beyond the holding in any case which has been cited and beyond the boundary to which we think corporate criminal responsibility should be carried.

There will be found dicta in some authorities diametrically opposite to the dicta in the opinions to which the Government has directed our attention. In Nobile v. United States, 3 Cir., 284 F. 253, 255, the Circuit Court of Appeals said: "Criminal liability of a principal or master for the act of his agent or servant does not extend so far as his civil liability. He cannot be held criminally for the acts of his agent, contrary to his orders, and without authority, express or implied, merely because it is in the course of his business and within the scope of the agent's employment, though he might be liable civilly. Commonwealth v. Stevens, 155 Mass. 291, 295, 29 N.E. 508." Cf. Paschen v. United States, 7 Cir., 70 F.2d 491, 503; United States v. Corlin, D.C. S.D.Cal., 44 F.Supp. 940, 946.

In Anderson v. State, 22 Ohio St. 305, it was held that it is competent for a defendant to rebut the presumption of prima facie agency arising from evidence against him by showing that an unlawful sale of liquor was, in fact, made without his authority and *against his direction.* The directions to the agent must, of course, be in good faith and not merely formal and colorable, the fact of agency being determinable by the *real understanding* between the principal and the agent. In our judgment, this is sound doctrine, applicable to a corporation, as well as to an individual.

We are in accord with the opinion of Judge Trieber in John Gund Brewing Co. v. United States, 8 Cir., 204 F. 17, 23, 24, and with the logically-reached decision in that case. The opinion points out that there is irreconcilable conflict among the authorities as to whether a principal may be held criminally liable for the acts of his agent, acting within the scope of his apparent authority but against the positive instructions of his principal, where the principal neither has knowledge of nor has given consent to the violation of law by his agent. The conviction of a nonresident brewing corporation for engaging in business as a wholesale dealer in malt liquors in North Dakota without paying the required tax was reversed upon the ground that the defendant corporation was entitled to show that the acts of its agents in selling liquor in North Dakota were, not only without its knowledge and consent, but in express violation of its instructions to them. The rejected evidence offered by the defendant was held by the Circuit Court of Appeals to have been competent, notwithstanding the fact that it was unnecessary for the Government to establish an unlawful intent on the part of the defendant corporation.

In the case before us, the unlawful action of Boyd in procuring delivery of a new furnace to Bowen has been shown, with no evidence to the contrary, to have been, not only without the knowledge of the appellant corporation of his illegal conduct, but also in express violation of its specific instructions to him and to all its agents. In these circumstances, the conviction of the corporation should not be upheld. Its motion for a directed verdict should have been granted.

The judgment of conviction and sentence of the appellant Holland Furnace Company is, therefore, reversed, and the case ordered to be dismissed. The judgment of the district court as to Boyd is affirmed.