**ST. JOHNSBURY TRUCKING COMPANY, Inc., Defendant, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 4881.**

United States Court of Appeals, First Circuit.

March 24, 1955.

John E. Hanscomb, Portland Maine, with whom Wilfred A. Hay, Portland, Maine, was on brief, for appellant.

Herman F. Mueller, Attorney, Interstate Commerce Commission, Boston, Mass., with whom Peter Mills, U. S. Atty., Portland, Maine, was on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

This appeal is from a judgment of the District Court of the United States for the District of Maine entered August 17, 1954, 122 F.Supp. 812, sentencing the defendant to a fine of $700.00 based upon a verdict by the court finding the defendant guilty of violating two regulations (49 C.F.R. 77.823 and 49 C.F.R. 77.817) promulgated by the Interstate Commerce Commission under 18 U.S.C. § 835.

On October 24, 1952, the defendant, one of the largest motor transportation companies in New England, transported 70 wet storage batteries from Cambridge, Massachusetts, to Portland, Maine. While the defendant's driver was unloading these wet storage batteries from the defendant's truck at the consignee's place of business, an inspector of the Interstate Commerce Commission made a spot investigation of the truck and of the shipping papers in the possession of the driver. The inspector discovered that although the batteries

weighed 3,550 pounds and were thus within the scope of 49 C.F.R. 77.823,[1] the truck was not placarded on each side and rear with a sign bearing the word "dangerous" as is required by that regulation. The inspector also discovered that the shipping papers in the possession of the driver did not state that the batteries were of a "white label"[2] nature, which statement is required by 49 C.F.R. 77.817.[3]

Evidence was presented at the trial by the defendant showing the efforts made by it to comply with the Regulations of the Interstate Commerce Commission dealing with the labeling of shipping papers relating to dangerous articles. The method of handling shipping papers in use at the defendant's Cambridge terminal at the time this particular freight was handled was the subject of considerable testimony by the defendant's billing office manager. It is not necessary to state in detail what this method was except to note that one employee, the rating clerk, was supposedly acquainted with the regulations in question and had the duty to attach the proper labels to any shipping papers of original carriers pertaining to dangerous articles such as these batteries. If he failed to attach the required label, or if the label, having been attached to the shipping papers with a paper clip, was accidentally dislodged therefrom after leaving the hands of the rating clerk and before it could be stapled to the defendant's shipping papers which were prepared by the billing clerk, there would be no possibility under the defendant's office system of the mistake being intercepted because only the rating clerk had any knowledge of the content of the Interstate Commerce Commission Regulations. The billing office manager testified that if the original carrier, which had transported the batteries from the shipper to the defendant's Cambridge terminal, had properly indicated the dangerous nature of the batteries on its shipping papers in the manner required by 49 C.F.R. 77.817, the defendant's billing clerk would have realized that the defendant's shipping papers required a white label. It appears, however, that the original carrier also had neglected to correctly label its

---

**1.** 49 C.F.R. "§ 77.823 *Marking on motor vehicles and trailers other than tank motor vehicles.* (a) Every motor vehicle transporting any quantity of explosives, class A, poison gas, class A, or radioactive material, poison class D requiring red radioactive materials label; and every motor vehicle transporting 2,500 pounds gross weight or more of explosives, class B, flammable liquids, flammable solids or oxidizing materials, corrosive liquids, compressed gas, class B poisons, and tear gas, or 5,000 pounds gross weight or more of two or more articles of these groups shall be marked or placarded on each side and rear with a placard or lettering in letters not less than 3 inches high on a contrasting background as follows:

|    |    |    |
|----|----|----|
| (1) | Explosives, class A | Explosives |
| (2) | Explosives, class B | Dangerous |
| (3) | Flammable liquid | Dangerous |
| (4) | Flammable solid | Dangerous |
| (5) | Oxidizing material | Dangerous |
| (6) | Corrosive liquid | Dangerous |
| (7) | Compressed gas | Compressed Gas |
| (8) | Poison gas, class A | Poison Gas |
| (9) | Tear gas | Dangerous |
| (10) | Poisons, class B | Dangerous |
| (11) | Dangerous, class D poison | Dangerous—Radioactive Material" |

**2.** See 49 C.F.R. 72.5; 49 C.F.R. 73.402(3); 49 C.F.R. 73.244(c) (31).

**3.** 49 C.F.R. "§ 77.817 *Shipping papers.* (a) Every driver of a motor vehicle transporting explosives or other dangerous articles shall have in his possession a manifest, memorandum receipt, bill of lading, shipping order, shipping paper, or other memorandum setting forth the following information for each class of such article being transported: The shipping name, the total quantity by weight, volume, or otherwise as appropriate of each kind of explosive or other dangerous article, and the prescribed label when required for the outside container of such article."

shipping papers. The defendant's rating clerk, of course, should have realized that "Electric Storage Batteries Ass. With Chemicals Wet", as the shipment was described on the original carrier's shipping papers, made necessary a white label on the defendant's shipping papers despite the original carrier's failure to indicate the white label nature of the batteries on its shipping papers.

The failure to placard the defendant's truck was a direct result of the failure by the rating clerk to label the defendant's shipping papers. The defendant's manifester, who totalled the weights of all dangerous articles to determine whether a truck was carrying more than the allowable 2,500 pounds (see 49 C.F.R. 77.-823, supra), and who had the duty to notify the defendant's dispatcher if any truck required placarding, relied solely upon the appearance of a white label on the defendant's shipping papers in determining whether or not the shipping papers related to dangerous articles.

The court, a jury trial having been waived, found that the defendant had violated 18 U.S.C. § 835, which insofar as is pertinent here, provides:

"§ 835. *Regulations by Interstate Commerce Commission*

"The Interstate Commerce Commission shall formulate regulations for the safe transportation within the limits of the jurisdiction of the United States of explosives and other dangerous articles including flammable liquids, flammable solids, oxidizing materials, corrosive liquids, compressed gases, and poisonous substances, which shall be binding upon all common carriers engaged in interstate or foreign commerce which transport explosives or other dangerous articles by land, and upon all shippers making shipments of explosives or other dangerous articles via any common carrier engaged in interstate or foreign commerce by land or water.

\* \* \* \* \* \*

"Whoever knowingly violates any such regulation shall be fined not more than $1,000 or imprisoned not more than one year, or both; and, if the death or bodily injury of any person results from such violation, shall be fined not more than $10,000 or imprisoned not more than ten years, or both. June 25, 1948, c. 645, 62 Stat. 739."

The court said [122 F.Supp. 813] that "The basic issue in this case is whether the offense with which the defendant is charged requires proof with regard to the element of criminal intent. The determination of the issue turns upon the meaning of the word 'knowingly' as used in section 835 \* \* \*." The court reasoned that this was a public welfare offense and that the case of United States v. Illinois Cent. R. Co., 1938, 303 U.S. 239, 58 S.Ct. 533, 534, 82 L.Ed. 773, was particularly applicable. That case was a civil action brought by the Government to recover from the respondent a penalty for having "knowingly and willfully" failed to comply with provisions of the Live Stock Transportation Act, 34 Stat. 607, 45 U.S.C.A. §§ 71–74. The respondent was held liable because of the negligence of its yardmaster who knew when the statutory 36 hour period beyond which cattle could not be continuously confined in a railroad car would expire, yet failed to notify the employee whose duty it was to unload the cattle prior to the expiration of that period. The district court reasoned that here as in the Illinois Central case "\* \* \* the language of such statutes as concerned herein must be considered in the light of the evils sought to be remedied." It then concluded:

"\* \* \* Thus, considering the purposes of section 835, the particular offense requires no element of criminal intent. \* \* \* In this instance, therefore, the only 'knowledge' or 'knowingness' necessary to a conviction is as to the nature of the commodity and its volume. If it is found that the defendant knew, or in the exercise of reasonable care should have known of the dangerous content of the batteries and the

weight of the shipment of said batteries exceeded 2500 pounds, and notwithstanding these facts, the defendant transported the cargo in interstate commerce, there would be a violation of the applicable statutes and regulations, herein concerned.

"Having in mind that at least three of the defendant's clerical employees inspected the invoices concerning this shipment; that the operator of the totalizer totalled the amount of weight of all dangerous articles assigned to this particular trailer; that the dispatcher, who supervised the loading of the trailer and whose duty it was to attach an explosive sticker label on the outside of the vehicle, inspected the manifest and saw the seventy batteries each of which bore four inch square white labels, denoting its dangerous nature; and, that the local driver had in his possession the manifest designating the type and amount of cargo, but lacking the proper inscription, the conclusion is inescapable that the defendant had complete knowledge of all of the essential facts relating to the transportation of these dangerous items."

The defendant contends that the instant case is within the scope of Morissette v. United States, 1952, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 and that Congress intended that the alleged violations must "be done with an evil state of mind".

We do not find it necessary to discuss at length whether or not the Morissette case is determinative of the issue here because the Supreme Court, three weeks after the Morissette case was decided, construed in Boyce Motor Lines v. United States, 1952, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367, the very statute with which we are concerned. The Morissette case, on the other hand, construed 18 U.S.C. § 641, a statute dealing with the crime of embezzling, stealing, purloining, knowingly converting, etc. property of the United States. Justice Jackson made an extensive analysis of the necessity of criminal intent in federal crimes and differentiated between common law offenses and public welfare offenses but did not attempt to construe the statute with which we are concerned here. He stated that the crime of "knowingly converting" required a mental element which the trial court had erroneously declared was not necessary. But the criminal statute involved in the instant case is not comparable with that construed in the Morissette case for Justice Jackson said that the particular category of crimes, i. e. embezzling, stealing, purloining, etc. involved in the Morissette case had been taken over from the common law and consequently required an element of intent. The statute with which we are concerned does not set forth an offense which was a crime at common law and therefore this case does not come within the scope of the main holding of Morissette v. United States, supra.

In the Boyce Motor Lines case, supra, the Supreme Court analyzed the history and purpose of 18 U.S.C. § 835, the statute involved in the instant case, and in many ways its history and purpose are analogous to those of statutes creating public welfare offenses which were discussed in the Morissette case. This would seem to lend strength to the Government's thesis that 18 U.S.C. § 835 creates a crime malum prohibitum and thus no criminal intent is necessary. However, the Supreme Court concludes its interpretation of 18 U.S.C. § 835 by stating in 342 U.S. at page 342, 72 S.Ct. at page 331:

"The statute punishes only those who knowingly violate the Regulation. This requirement of the presence of culpable intent as a necessary element of the offense does much to destroy any force in the argument that application of the Regulation would be so unfair that it must be held invalid. * * *"

This statement conflicts with the statement of the trial court in the instant case that "* * * the particular offense requires no element of criminal in-

tent". It may be true that "culpable" and "criminal" are not identical in meaning, but it is clear that the trial court erroneously interpreted 18 U.S.C. § 835 as requiring no element of culpable or blamable intent and thus committed reversible error. As further authority for the holding that 18 U.S.C. § 835 requires the proving of culpable intent the Court of Appeals for the Third Circuit, when the Boyce case was before it, stated "When the regulation is read with 18 U.S.C. § 835, the statute under which it was promulgated and which makes its violation a criminal offense, it becomes clear that the offense is not merely malum prohibitum but that a specific wrongful intent, i. e., actual knowledge of the existence of a duty under the regulation and a wrongful intent to evade it, is of the essence of the offense. This the United States concedes." United States v. Boyce Motor Lines, 3 Cir.,1951, 188 F.2d. 889, 890, 891.

The Supreme Court in the Boyce Motor Lines case provided a guide for the district court in the trial of alleged violations of Interstate Commerce Commission Regulations such as involved in the instant case. It was stated in 342 U.S. at page 342, 72 S.Ct. at page 330, that in order to sustain a conviction for violating an Interstate Commerce Regulation providing that " 'Drivers of motor vehicles transporting any explosive, inflammable liquid, inflammable compressed gas, or poisonous gas shall avoid, so far as practicable, and, where feasible, by prearrangement of routes, driving into or through congested thoroughfares, places where crowds are assembled, street car tracks, tunnels, viaducts, and dangerous crossings' " the Government must not only "prove that petitioner could have taken another route which was both commercially practicable and appreciably safer (in its avoidance of crowded thoroughfares, etc.) than the one it did follow. It must also be shown that petitioner knew that there was such a practicable, safer route and yet deliberately took the more dangerous route through the tunnel, or that petitioner

willfully neglected to exercise its duty under the Regulation to inquire into the availability of such an alternative route."

Similarly here the Government must prove that the defendant, aware of the dangerous nature of these batteries, deliberately chose to transport them without placarding its trucks or labeling its shipping papers or that the defendant willfully neglected to take proper precautions in order to prevent dangerous articles being transported in violation of the applicable Interstate Commerce Commission Regulations.

The judgment of the district court is vacated, the verdict is set aside, and the case is remanded to that court for a new trial.

MAGRUDER, Chief Judge (concurring).

I agree that the judgment of the district court should be set aside and the case remanded for further proceedings. It may be, though this is not entirely clear, that the district court was led to enter judgment against the defendant by reason of an erroneous view of the law. In its opinion, the district court said [122 F.Supp. 816] that the particular offense charged in the information "requires no element of criminal intent", and that if it is found that the defendant knew, "or in the exercise of reasonable care should have known, of the dangerous content of the batteries and the weight of the shipment of said batteries exceeded 2500 pounds, and notwithstanding these facts, the defendant transported the cargo in interstate commerce, there would be a violation of the applicable statutes and regulations, herein concerned." That language would seem to sanction a conviction of the corporation on the basis of negligence merely, which I think cannot be done under 18 U.S.C. § 835, imposing a penalty upon "whoever knowingly violates" a regulation of the Interstate Commerce Commission.

The opinion of the court simply applies the language of the Supreme Court in

Boyce Motor Lines, Inc., v. United States, 1952, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367. If it be thought that the indicated requirement of proof will seriously hamper effective enforcement of the Interstate Commerce Commission regulations, the answer is that Congress is at liberty to fix that up by striking out from 18 U.S.C. § 835 the prescribed element of *mens rea*—"knowingly"—as applied to violation of regulations of the sort here involved. That is to say, Congress could convert the offense into what sometimes has been called a "public welfare offense", requiring no element of guilty knowledge or other specific *mens rea*, by providing that whoever, by himself or by agent, transports explosives, poison gas, flammable solids, or other dangerous commodities without the safeguards which may be prescribed by a lawful regulation of the Interstate Commerce Commission, shall be guilty of a public offense and subject to penalty. See the discussion in Morissette v. United States, 1952, 342 U.S. 246, 252–260, 72 S.Ct. 240, 96 L.Ed. 288.

If a statute provides that it shall be an offense "knowingly" to sell adulterated milk, the offense is complete if the defendant sells what he knows to be adulterated milk, even though he does not know of the existence of the criminal statute, on the time-honored principle of the criminal law that ignorance of the law is no excuse. But where a statute provides, as does 18 U.S.C. § 835, that whoever knowingly violates a regulation of the Interstate Commerce Commission shall be guilty of an offense, it would seem that a person could not knowingly violate a regulation unless he knows of the terms of the regulation and knows that what he is doing is contrary to the regulation. Here again the definition of the offense is within the control and discretion of the legislature.

In the case at bar the defendant is a corporation. This artificial legal entity cannot "know" anything, except to the extent that the knowledge of some human being or human beings, acting for the corporation, is attributed to the corporation. The legislature, if it chooses, may be precise about this; but often it is not, and the courts have to do the best they can by implication. In the absence of legislative precision in the matter, some courts have construed and applied criminal statutes to mean that a corporate defendant cannot have the prescribed guilty knowledge unless some higher official of the corporation— perhaps called an *"alter ego"* for the corporation—has such knowledge. See People v. Canadian Fur Trappers Corp., 1928, 248 N.Y. 159, 161 N.E. 455, 59 A.L.R. 372. So far as I can find, the federal courts, in construing imprecise Acts of Congress, have not generally drawn such a line in the hierarchy of officers or agents of the corporation. See United States v. George F. Fish, Inc., 2 Cir., 1946, 154 F.2d 798, 801, certiorari denied 1946, 328 U.S. 869, 66 S.Ct. 1377, 90 L.Ed. 1639; United States v. Armour & Co., 3 Cir., 1948, 168 F.2d 342, 343; Boston & Maine R. R. v. United States, 1 Cir., 1941, 117 F.2d 428, 431. In other words, in applying to a corporation an Act of Congress punishing "whoever knowingly" does something, it is usually held to be enough to charge the corporation with guilt if any agent or servant of the corporation, acting for the corporation in the scope of his employment, has the guilty knowledge, in accordance with the general principles of the law of agency as applied in determining civil liability. See Am.L.Inst., Restatement of Agency, § 272 et seq. On this view, it would not be enough to absolve the corporation from liability for a criminal offense of the sort here in question, that no member of the board of directors, or no one of the higher executives, knew that a dangerous commodity was being transported by the company truck in a forbidden quantity without the markings required by the regulation. Nor would it be enough that the higher executives of the corporation, as the defendant sought to show here, took the utmost care to lay down for the guidance of the subordinate employees procedures designed to assure compliance with the regulation. If the rating clerk,

who apparently was aware of the requirements of the regulation, had actual knowledge that the impending shipment was of "wet" storage batteries, and had been charged by the corporation with the duty of passing this information on to the defendant's manifester; and if the manifester, who subsequently weighed the shipment, was aware that it weighed in excess of the allowable 2500 lbs., then these two items of knowledge possessed by these two employees in the course of their duties would be attributed to the corporation. Therefore, on that hypothesis of fact, when the defendant's dispatcher, in the regular course of his duties, caused the shipment to be taken out by the defendant's truck driver, I should think it would have to be concluded, as charged in the information, that the corporation "did knowingly transport by motor vehicle a shipment of 70 wet electric storage batteries, complete with chemicals, a corrosive liquid, weighing 3,555 pounds, on public highways, from Boston, Massachusetts, to Portland, Maine * * *" without the prescribed warning placards.